Tim Corrigan from the Middle District of Florida. Judge Corrigan is a graduate of Duke Law School. He served as a magistrate judge in the Middle District of Florida, was appointed to the district court bench in 2002. Is that right? That's correct. 2002. He just finished serving a term as the chief judge of the Middle District of Florida. He's been here with us a number of times and we're very grateful that he's agreed to come help us one more time. You're familiar with our lighting system. When the yellow light goes on, that means that your time is drawing to a close. So begin to wrap up. If we take you beyond the red light, just keep talking. Okay? And with that, we're ready to begin. Our first case is number 24-10875. The Florida Agency for Health Care Administration versus the Administrator for the Centers for Medicare & Medicaid Services, Mr. Panuccio. May it please the Court, Jesse Panuccio for the State of Florida and the Agency for Health Care Administration. I'm attempting to reserve three minutes for rebuttal. At stake in this case are billions of dollars of Medicaid funding put at risk by an unpromulgated rule adopted by CMS to disallow federal matching funds if private Medicaid providers make private arrangements that have the net effect of offsetting Medicaid tax payments. That rule contravenes the relevant statutory hold harmless prohibition, which reaches such arrangements only if they are directly I guess jumping right into the merits. I don't think I quite understand where in the statutory language you get what you just said, that the guarantee itself must come from the state or the government. The way I read it, the clause basically says the government has to provide something and that that thing that is provided must guarantee. But not necessarily that the Well, I think we start with the text, Judge Newsom, and if you look at all of the words that Your Honor just recited, each of those words or terms, provides for, guarantee, and directly, and everyone agrees this is about direct guarantees, not indirect. All of those words, the dictionary definition of those words, connote that the entity providing something is doing more than just being a passive link in a chain. So I guess I'm curious less about dictionary definitions than maybe its syntax or structure or something, but just the way I read the sentence, it says that there's a hold harmless provision in place when the state or other governmental entity provides directly, we'll say, for any payment, offset, or waiver that guarantees to hold taxpayers harmless. So it's the payment that must guarantee, not the government that must guarantee. Well, the payment being made by the government. And the word guarantee means to undertake or insure for another, to make oneself answerable for something, to promise. Even if you take that reading of it, Your Honor, the payment itself, the fact that the state makes the payment in this scenario guarantees nothing. It is a private relationship, maybe a private contract. In fact, it doesn't even, there may not even be a guarantee among the private parties because what the CMS said in its bulletin is we're going to reach any arrangement, informal or formal, oral or written, whose net effect is an offset. That is so far divorced from the word guarantee, which connotes some kind of active legal status that it will do something, it is guaranteed to do something. And the other words have a similar dictionary definition. But there are other reasons, Your Honor, that the statute cannot mean simply net effects. Let's take, I'm sorry. I don't want to take you away from the merits argument, which I think is difficult and obviously important. But I want to ask you a precursor question about finality. Yes. And it's a procedural question. You recently submitted a supplemental authority. Some of the procedures, directives, requests, whatever you want to call them that CMS has sent, right, indicating what it's going to be looking for and what document it's going to be requesting. At what point do we look at finality? Well, I think Do we look at finality at the time that you took the notice of appeal? Or do we take finality on a practical basis and continue to see further developments down the line to see whether or not something that may or may not have been final at a prior time has now crystallized into something final? Well, let me answer that in two ways, Your Honor. One, we submitted the notice of supplemental authority actually as a supplement to irreparable harm. On finality, I don't think it changes anything because it shows that both of the prongs of the Hawks test are still met. The agency's view of this hold harmless provision is not changing. In fact, it is now requiring that view to be enmeshed in these terms and conditions. But the other thing that's not changing is they're enforcing it. They are moving forward with enforcing it. So I think at the time we appealed and at the time we sued, the bulletin was final agency action for multiple reasons. The only prong of the test that's at issue in this case, the agency has, CMS has What would be the effect of the decision that this is not final agency action? What's going to happen? What's going to happen? Well, CMS has made various efforts to enforce their interpretation that is in the bulletin for the first time. They put Florida under a financial management review. They have also added these terms and conditions to the state Medicaid plan. And beyond that, they've put out a supplemental bulletin to the original bulletin saying we are deferring some of this until 2028, but other things are enforced right now and states need to be taking action right now. The policing and informational obligations that the bulletin announces for the first time, they expect states to be moving on those issues right now. And this is why I should add the Texas court had no I didn't agree with what you said, but by now you mean 26, right? They have to come up, they have to provide some information in 26. Well, there's two different things going on. Yes, according to the terms and conditions that we filed on Friday, by 26, CMS has said they want Florida to provide detailed explanations of all arrangements in the state. So Florida right now has to be in the process of spending the money, changing the agency to do these kinds of fiscal audits it has never done and is not equipped to do. That is part of the harm. But separate and apart from the terms and conditions that we filed, you have the supplemental bulletin where CMS said we've heard from states that the original bulletin is highly disruptive and so we are going to defer full enforcement to 2028, but some pieces of it we are enforcing now. For example, if there are any new arrangements in the state, we expect you to be policing those right now. For pre-existing arrangements, we may defer until 2028 any cancellation of Medicaid funding, but we are not changing our obligation to acquire this information now and police these arrangements now. So they are very much enforcing now, but I want to be clear, this is a pre-enforcement challenge to the bulletin. The Supreme Court case law is very clear in case after case, you do not have to wait for an enforcement action when you have a final agency rule, unpromulgated or not, and that is what we have here. And a case that is very much on point, for example, is the Tennessee case, Tennessee v. Federal Department of Education out of the Sixth Circuit in 2024, that is 104F4577. In that case, there were guidance documents similar to this bulletin about the meaning, but they were redefining the agency's view of discrimination and telling the states, your state universities now need to comply with this or you face a risk of loss of federal funding. And the Sixth Circuit said very clearly, that is final and reviewable because the policy announced forced states to alter their conduct or risk losing their federal funding. And this goes all the way back to Abbott Labs, Your Honor. Abbott Labs made very clear, and this is a quote, an authoritative interpretation of a statutory provision that has a direct effect on the day-to-day business of regulated parties, puts them in a dilemma of either complying or risking enforcement. And the Supreme Court does not require parties to risk that dilemma. They repeated that holding in free enterprise fund in 2010, again in the Hawks case in 2016. And again, the Sixth Circuit just in 2024 reiterated that holding. I'd like to turn back to the merits unless the Court has additional questions on finality. So I've got another question about the merits just to circle back to the discussion that you and I were having earlier. I think I understand your answer to my question about sort of what I view as sort of the bifurcation of that sentence, that the government has to provide the payment and the payment has to guarantee. But I mean, does CMS's interpretation really reach anything for which the payment doesn't guarantee if it says in effect that the, you know, it reaches only payments that would result in the taxpayer being held harmless? Well, don't take my word for it. This is what CMS said in 2008. If you read the preamble to the 2008 rule, and this is at page 9694, column 2, they had had in their what kind of tests they were going to adopt. And states responded and said this is too far reaching. And what CMS said is that, quote, influenced by the state is too broad a term. Controlled or directed by the state is a more accurate description of the types of payments that will be considered in evaluating whether an impermissible hold harmless arrangement exists. And I think that's right. When you look at the word guarantee, it cannot just be that the state payment is one step in a causal chain, many steps down the line, which will ultimately result in. That's how they want to read the word guarantee. They want to say guarantee just means result in. We think guarantee means more than that. Something that actually, by doing it, has legal force and effect of ensuring the taxpayer will be held harmless. Does that make that provision of the hold harmless rule sort of sui generis or idiosyncratic? Because the other three are kind of results tests, right? Yes. And this is very important, Your Honor. And let me explain why. So if you look at the statute, and this is my contextual point, aside from dictionary definitions, there are really four tests in W-4. There's A, B, C-1, and C-2. B and C-2 are both about Medicaid payments, and they are results-based tests. A and C-1 are about any other payment. A, again, is a mathematical results test, any positive correlation. If C-1, a direct guarantee, means what they say, C-1 reaches any payment anywhere that has the net effect of reimbursing all or even part of it. So what would happen is there's no need for any of those three effects-based tests, because now you have an effects-based test that captures every possible reimbursement. So why would Congress have come up with three very carefully reticulated tests based on effects and then done a catch-all that says all effects are also In other words, the indirect guarantee that C-2 spells out is meaningless if C-1 catches everything. And that is a very carefully reticulated test. Yeah, I sort of see that going both ways. On the one hand, you might say, or the other side might say, well, it would be awfully weird to have four paths to hold harmless liability, only one of which happens to be an intent or sort of like effect plus test. It seems like they all kind of sort of work in the same way. On the superfluousness point that you're making, is this a little different from your standard superfluous scenario where here it's like four ways of skinning the same cat? These are all trying to get at roughly the same thing. Is there or is there not a hold harmless arrangement in place? So that seems a little bit different from where you would have one sort of canceling out the other. May I answer? Yeah, please. Okay. So, no, I think it's a standard superfluousness argument because what that canon usually says is we read all provisions to have some kind of independent force. And if you have this catch-all that catches everything and more, there is no need for any of those tests. My point is that if CMS is right about how sweeping this direct guarantee language is, and no, they don't give any meaning to the word direct, direct guarantee. But to go back, if it is as sweeping as they say it is, then there really is no function for those other three tests because everything and more is caught. And to answer the first part of your question, Your Honor, why would this test be different? I think this test would be different because Congress was saying, look, there are scenarios that will look so much like reimbursement, we are going to catch them based on effects. And we don't want to do that all of the time. We want to do that, for example, take C2, when the tax is 6% and it's a reimbursement of 75% of providers at 75% rate. Very carefully articulated test for that, right? But I think what Congress is saying in C1 is, but if you directly guarantee, if you set up a program that says you pay the tax and we're reimbursing you for all or part of it, then that's no good, even if it wouldn't trigger one of our tests. You cannot directly do this. So the only thing, I guess, that I'll say and then give you time to think about for your rebuttal is that the statute doesn't say anything about directly guaranteeing. It says directly paying. Well, two points on that. I don't think it ultimately matters because, again, the payment has to be the thing that guarantees. And so here, the payment doesn't directly guarantee. You make a payment and then if there is a certain type of arrangement controlled by private parties where the state has no control, there's another step. So it doesn't directly guarantee at all. But the only other thing I'd say is C2 answers this for us because what C2 says is an indirect guarantee will be found under the following circumstances. So the statute tells us, most probably, that the notion of direct and indirect is meant to apply to the guarantee itself. Otherwise, C2 would make no sense. Why is Congress defining an indirect guarantee, which comes from the same language, if, in fact, indirect and direct are modifying a different word in the statute? Thank you very much. Thank you. Thank you. Mr. Henshawood. Good afternoon, Your Honors. May it please the Court, Brett Henshawood on behalf of the Federal Government. I'd like to begin by talking where the District Court began and ended its analysis, which is with finality and the absence of final agency action here. So Florida, I think, at this point recognizes that it cannot challenge the financial management review that CMS initiated as final agency action, that Standard Oil forecloses that sort of challenge. So it is now trying to find something further up the chain, this time the informational bulletin, and try to tag that as final agency action that it can now challenge. But we know that the financial management, excuse me, that the informational bulletin is not itself final agency action because it doesn't change anything about the legal landscape under which Florida operates. All the obligations Florida has... How close is the bulletin to the proposed rulemaking that didn't go into effect? I think it's quite close, Your Honor, in terms of how the agency has thought about it. But even going back to the 2008 rulemaking... Doesn't that, from a practical perspective, sort of lean in the way of finality? Your Honor, I think if we want to talk about the practical effects, I mean, we have to find some legal effect that flows from the bulletin. And I think one helpful way to think about it is if the bulletin didn't exist, would anything be different, right? Would CMS still be able to conduct this investigation? Would it potentially be able to subject Florida to some sort of penalty? And the answer to that is yes. And part of the way we know that's true here is if you look at document 22-2 in the record, that's... But now our bulletin says that you're going to do that, that we're on our way and we're going to enforce this. And so does that set up a pre-enforcement challenge then? If I could complete the answer I was just giving, if you look at document 22-2 in the record, it starts at page 208 of the Joint Appendix. That's a letter that CMS sent to Florida in September of 2022, five months before the informational bulletins ever issued, right? And that letter spells out this interpretation of what WC4 covers and says we are going to initiate a financial management review of the State of Florida for compliance. We're concerned about these types of tax arrangements and we want to, you know, get information about them. And so that's five months before the bulletin ever issues. So what the bulletin does, all the bulletin does, is announce to other people, hey, you know, we've been getting these questions and we want to let you know our view of the statute is, and, you know, referring back to the 2008 rule, applying the same definition the agency gave in the 2008 rule, that, you know, we think these are covered. And then a few days later when CMS issues its next letter to Florida that actually contains requests and its first questions under the FMR, it refers back to the September letter that predates the informational bulletin. So... Were you suggesting that somehow this is final agency action as to other states but not as to  No. Your answer to Judge Corrigan's question about the bulletin's threats was, oh, well, we had threatened them. We had threatened Florida before. We didn't threaten anyone else in the bulletin. Right. My point is not that it's final to some people and not to others. My point is when you these questions about when an interpretive rule in particular or an interpretive document from an agency is final agency action, because, I mean, it has to be the case that, you know, many, if not the vast majority, of sort of just statements about what the statute means from the agency are not themselves final agency action. We know that there are some, right? We know that there are some. And so the question is how do you sort of figure out when it is and when it isn't? And I think what courts have generally looked at or a sort of simplistic way of thinking about it is, again, if the document didn't exist, would anything be different? And, you know, I think that's true even if the September letter didn't exist. We wouldn't say this imposes any new interpretation or obligation that didn't exist before. But it's certainly true What is the challenge if no rulemaking goes into effect through an ADA notice and process? So if at some point Florida, you know, at some point in the future there may be a determination by CMS about whether or not these types of hold harmless arrangements exist within the state, because I think it's also important to remember in this context, at this stage we have no idea whether any arrangement of the type described in the bulletin exists in Florida. Florida says it doesn't know whether such arrangements exist. So we're in a very odd posture where the state is here saying, well, we need an injunction and we need all this, you know, we want to challenge this final agency action or supposed final agency action without any determination from anyone about whether or not this final agency action actually, you know, affects any arrangement in the state of Florida. So, you know, that's the part of the point of the Financial Management Review is to ascertain what the facts on the ground are in Florida. And I mean, one aspect of the finality inquiry and also of the ripeness inquiry is thinking about interference with the administrative process. I mean, Florida's been very explicit here. What it wants in part is an injunction against the FMR because it, you know, it doesn't want to have to sort of comply with the investigation even if, you know, it may well be that what the investigation uncovers is other arrangements that violate the statute even on Florida's understanding or, you know, might violate, you know, the statute on CMS's understanding but not Florida's understanding. You know, we don't know at this stage. But I think, you know, as Mr. Panuccio said there at the end, he said, look, you know, in all candor, this is a pre-enforcement challenge and pre-enforcement challenges are a thing. And we don't have to wait for the FMR to proceed necessarily before we challenge it. And I'm not really sure how much kind of philosophical space there is between the bulletin and the commencement of the FMR. I mean, where in there would we imagine if there is such thing as a pre-enforcement challenge? Well, Your Honor, I mean, the point is, in the same way you can't challenge the FMR, we don't think you can challenge the bulletin. Just a statement about what the statute means in the abstract in a vacuum is not creating legal consequences within the meaning of Bennett and Hawks. I mean, that's not. I mean, otherwise, every interpretive rule would be final agency action. And we know that can't be right. And so, we have to be looking for some concrete legal consequence that flows, you know, from the particular interpretation the agency has advanced, you know, the particular... No, because for a couple of reasons. One, of course, is that within the context of the FMR and then also just in terms of the State's general obligations, there are multiple regulatory requirements that the State has to provide information upon request to the Secretary. I mean, it's a heavily regulated federal program and obviously CMS has the authority to, you know, undertake investigations. I'm not saying it's improper. I'm asking whether or not the request for information pushes the decision more towards one being a final... Right. Well, no, I mean, I think because then you're back into the sort of standard oil world. I mean, there, I mean, the Supreme Court held very clearly that, you know, even an administrative complaint and administrative litigation, you know, an actual administrative proceeding for enforcement is not final agency action. It's just the burdens of complying with that kind of thing don't qualify, even if they reflect a determination by the agency that it thinks, you know, some conduct or some misconduct has occurred or whatever. So, the fact that the... And the fact is the obligations the State has to provide information, again, don't flow from the bulletin. Those flow from the other regulatory obligations that the State is under. So, again, the informational bulletin, if it didn't exist, exactly the same financial management review could be taking place under exactly the same theory, investigating exactly the same arrangements and seeking evidence or, you know, could uncover evidence of different arrangements. So, for example, it's not clear to me on Florida's view if, you know, the State or Broward County or whoever went to providers and said, hey, you guys should create this kind of distribution system amongst yourselves. And we will create a State law and a local ordinance that will facilitate you doing that, but don't tell us about it. You guys should go do it on your own. It's not clear to me how Florida thinks that would cash out under the statute, but, I mean, that's, again, part of, if you look at some of the inquiries that the agency has made that are attached to Florida's complaint, part of the questions are, well, what did you talk about with the providers? You know, how do we know how this is being enforced or money is being used? What should we be taking away from what's going on in Texas? What, tell, what, I take it you don't agree with that ruling, but what, where is the case now? What, what lessons do you draw from it? Why, why should we not agree with what the district judge did out there? Yeah, so that case is, summary judgment has been briefed but not ruled on yet in the Texas case. The, I think with respect to finality in particular, because that's what we're talking about at the moment, the Texas judge really just, his entire final analysis is focused on this idea that CMS had changed its position in some way and I think we've addressed that at length in our brief and I'm happy to talk about it in greater detail, but that was really the focus of that judge's analysis and we don't think there's any basis to that particular claim here. The 2008 rule laid out a test for, you know, how the agency has understood what constitutes a direct guarantee and what constitutes, you know, an impermissible hold harmless arrangement and that's exactly the test that the agency has applied, describes again in the bulletin and would apply in the event, you know, it uncovers any particular arrangements in Florida in the course of its review. Is there any reason, are you involved in Texas litigation? I mean, like I said, the case is in district court at the moment and waiting on some, a summary judgment ruling, but. I just mean personally. I'm wondering why it wasn't appealed. I mean, that's a, you know, determination. It's up to the Solicitor General and I can't, you know, get into those deliberations, but obviously that case is, you know, we've continued to defend the policy in the context of the summary judgment motion there. Would you mind, if my colleagues are okay with this, would you mind pivoting to talk about the merits? I'm happy to do so. I do, if we can do it in the context of the merits or otherwise, but I would like to address the Friday night letter at some point, just so I can address it, whether you do it now or later. Okay. I mean, so that particular letter that was filed Friday night provides documents that Florida received from CMS in January. I'm not sure why their relevance became suddenly important, but what that reflects is the approval or renewal of Florida's demonstration program under Medicaid, as in connection with the demonstration program, CMS can put conditions on, you know, that demonstration program, again, independent of anything in the bulletin. So, I think for the same reasons, it doesn't have any new or different relevance. I understand my colleague to only rely on it for purposes of irreparable harm, but again, whatever conditions are put on those demonstration programs, you know, would flow from the conditions themselves. Any harm would flow from the conditions themselves rather than from the bulletin itself or something else. So, I'm happy to file a written response to that at some point after today, but I did just want to briefly address that. It's a unique situation, a unique document, and it's not one that bears on to, I think, your question, Judge Jordan, finality, which, you know, would be the same regardless. All right. So, on the merits, you heard me talk to Melissa Panuccio about sort of my own reading of this sentence, which I think sort of bifurcates the government doing the paying and the payment doing the guaranteeing. Maybe he'll knock me off of that view, but I think maybe the better response in my mind to my question was, fine, take that. Let's look at the word guarantee. Is the payment here really doing any guaranteeing, or is it just kind of like, I don't know, maybe it will, maybe it won't. Depends on how the private hospitals divvy up the funds or whatever. What's your response to that piece of his response? Yeah, so I think with respect to that, we know that the guarantee here, what CMS has long said, so starting in the 2008 rule, for example, CMS says, look, a guarantee exists when the payment is provided and there's a reasonable expectation that it's going to reimburse some or all of the tax. And there's no question here that when the payment is provided, if there's disagreement, there's a reasonable expectation that, you know, there's going to be a reimbursement of some or all of the tax. So I don't think there's any, you know, certainly an intent requirement or anything of that nature. Well, he might respond, fine, fine, fine, but you just recited CMS's own position. The question here is whether CMS's position is consistent with the statute and this whole reasonable expectation that it would result in thing is not a guarantee. I think that's what he might say. Right. Well, I mean, I think if that's really where we are, then it's very odd to treat the position because, again, CMS is repeating the same thing in the bulletin it repeated, but... But if we cross that line and we borrow from the agency action and we are trying to determine whether this reasonable expectation that would result in test is consistent with the word guarantee, now what? Yeah. So I think there actually C-2 is instructive, right, because there it's talking about an indirect guarantee. And there there's not, you know, a guarantee that every provider will receive their tax or will receive the whole tax or will receive even a part of the tax. Instead, Congress recognized that the term guarantee can encompass these sort of like factual scenarios in which it happens that there is a reimbursement as a result of the way the tax structure works. And so, you know, here it's much more straightforward because, you know, the providers in these arrangements, which again may or may not exist in Florida, these arrangements are predicated on the idea that these providers are, in fact, going to divide up these funds in a particular way to affect that reimbursement. But, you know, the same principle applies under C-2 or anyone else. The term guarantee, just in this sense, is referring to sort of indemnifying the, you know, the tax, the taxpayer in the first instance. If there are no further questions, I'm happy to rest on our brief. Thank you, Your Honors. Thank you. I'd like to first make an additional merits point and then I'll just have a few rebuttals on finality. Judge Newsom, to get back to some of your questions about the meaning of this, I've gone through definitions and structure, which I think both point in our way, point in our direction. But I'd like to make two additional points. First of all, I did not hear my friend in his oral presentation and certainly did not find in their brief any liquidation of the term direct. We are dealing with a direct guarantee. No, no, no, direct payment. Just sort of direct payment that itself guarantees. Well, again, the statute. I view them as one and the same. Although the statute says in the very next paragraph, indirect guarantee is defined as follows. So that must mean something. There must be some congressional indication there that that direct is getting back to guarantee. And this is what Judge Kornodal said. There is a tight grammatical link in the statute and you cannot ignore that. I think the Federal Government is ignoring the term direct. But the other thing the Federal Government is ignoring is just how absurd their reading can become in practice. Because what they say is any payment, remember what this statute says, any payment that has the net effect or result economically of holding harmless for any portion of the tax is prohibited. And they say in their preambles all over the place, money is fungible so it doesn't matter what form the payment comes in. It doesn't matter if it's a tax rebate or even affiliated with it. So under their reading, once a state pays this tax, any economic relationship between the state and the hospital will be subject to this net effects test. So imagine you have a hospital that says we are going to build a new institution in a rural county on a brownfield, an ecologically damaged property. States have grants for that type of thing, right? If you build on this and you fix the environmental damage, we will give you a grant, maybe a tax rebate. Under their view, that tax rebate for a completely unrelated program, because it might have the net effect, because money is fungible of paying back some of the tax, would be forbidden. That can't possibly be right. The other absurd result of their reading is that billions of dollars of state Medicaid funding, perhaps... Do you think CMS's position has completely ignored any causal effect requirement? Yes, I think they say so explicitly in their briefs and in the bulletin. They say the only test is a net effect. We will just, money is fungible and we will look at if the state taxes here and gives money back over here, that's a hold harmless. So that can't be. It can't be and that's... To the point that it helps you, because if you have the taxing scheme that you indicated and then the state of Florida decides that it's going to give a, let's just use a whole number, a $500,000 grant to every medical institution that has a cancer treatment center, you think that's covered? Under their view, which we think is too far of this particular provision, yes, because they say... I don't think that's right for them. I don't think it's right for you either. Well, here's why we say it's not right, because that word guarantee, that word provides for, if you look at the dictionary definitions, they all show some kind of state intentionality, state orchestration, state effect. And they want to get to arrangements where the state has no say whatsoever or no intention for the two things even to be related. That is ultimately their position because they say at the end of the day, the only thing we care about is the net effect. Now, Congress did care about net effects. The net effect can't be completely divorced from circumstance. I agree. But the only way you can get there is by giving some meaning to the words provides for and guarantee. And this provision, there are three net effects provisions, and they have careful mathematical formulas. Congress understood that net effects might matter, and what they said is, look, if you see two, A, B, those are all results-based tests, and we only want certain results to be captured by this. But we have one more provision. If the state sets up a system where they say, we're going to tax you here and we're going to offset or refund you over here, and they're connected in some way, then that's bad, too, and you can't do it. But it cannot be there's just this new free-floating net effects test. What the DAB said, what CMS's own appeals board said in 2005, is you are trying to create a new indirect guarantee test that Congress did not create. Congress knew there could be indirect guarantees, and the only time they're going to catch them is when C-2's careful formula is in play. And this isn't that. This is a direct guarantee case. It is. And what they're trying to do is redefine direct guarantee to encompass more indirect guarantees because they're not satisfied. There is an easy solution here, Your Honor. If we don't know exactly how they're going to try to take enforcement action. Well, this is not the rule. We don't know what sort of hypothetical scenarios are going to be captured by Florida's response to CMS's request for information. We, well, we do know because they explain exactly the type of arrangements they say now. Well, we know theoretically. We don't know in fact because Florida hasn't responded yet. Two answers to that, Your Honor. One is that CMS has never said that their reading of this provision of 1396W4 is somehow tentative. They have said, this is our reading. This net effects test is exactly what that statute means. Now, they say it's longstanding. We outlined in our brief the many contrary statements over the years. But I would note, even if it is longstanding, they've not raised the statute of limitations defense here at any point. Not here in the Court of Appeals. Not below. Their policy on this is final. The other thing that's final in the bulletin, and that is new, is they say states must right now start doing all of the following things that they've never done before with their Medicaid program. They must audit every private provider for every type of interlocking financial arrangement to figure out if there is a net effect. They have never made that inquiry before. That is a very intrusive program altering requirement. It is why two of the largest states in the country are suing on this. Because it will fundamentally alter the Medicaid programs in both states. There are direct real world effects right now that are quite final. And CMS is not backing off of any of them. Both their substantive position on how they interpret the statute and the new informational requirements. If there are no other questions. Thank you, your honors. We appreciate the help.  Case number two.